UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YOLANDA LOTT,                           CASE NO. 20-11727

     *Plaintiff*,                      HON. JUDITH E. LEVY
*v.*                                    DISTRICT JUDGE

COMMISSIONER OF                         HON. PATRICIA T. MORRIS
SOCIAL SECURITY,                        MAGISTRATE JUDGE

     *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 16, 19.)**

## I.    RECOMMENDATION

Plaintiff Yolanda Lott challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits ("DIB"). The matter was referred to me for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's final decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 16), **GRANTING** the Commissioner's motion, (ECF No. 19), and **AFFIRMING** the Commissioner's final decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff's application for DIB was filed on September 12, 2017. (ECF No. 11-5, PageID.172.) Plaintiff alleges she became disabled on December 2, 2013. (*Id.*) The

Commissioner denied the claim. (ECF No. 11-4, PageID.99–115.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on May 20, 2019. (ECF No. 11-2, PageID. 65–81.) The ALJ issued a decision on June 3, 2019 finding that Plaintiff was not disabled. (*Id.* at PageID.49–64.) The Appeals Council denied review on April 23, 2020. (*Id.* at PageID.38–43.) Plaintiff sought judicial review on June 26, 2020. (ECF No. 1.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 16, 19, 21.)

### B.    Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to

be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement . . . or a
> combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your
> impairment(s). If you have an impairment(s) that meets or equals one of our
> listings in appendix 1 of this subpart and meets the duration requirement, we
> will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional
> capacity and your past relevant work. If you can still do your past relevant
> work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual
> functional capacity and your age, education, and work experience to see if
> you can make an adjustment to other work. If you can make an adjustment

to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 11, PageID.60.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from the alleged onset date of December 2, 2013 through her date last insured of December 31, 2013. (*Id.* at PageID.54.) At step two, the ALJ concluded that Plaintiff's severe impairments were cardiomyopathy, hypertension,

4

and obesity. (*Id.*) Further, the ALJ found Plaintiff's history of syncope and headaches, alone or in combination, were not more than minimal limitations to Plaintiff's ability to perform basic work activities for a continuous 12-month period before the date last insured. (*Id.*) These impairments did not meet or medically equal a listed impairment at step three. (*Id.* at PageID.55.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC")

> to stand and walk 6 of 8 hours; sit up to 6 of 8 hours; lift 20 pounds occasionally and 10 pounds frequently; occasionally climb, balance, stoop, kneel, crouch, or crawl; never climb ropes, ladders or scaffolds; avoid all hazards such as open moving machinery and unprotected heights; and needed a clean air environment free from concentrated levels of dust, fumes, chemicals, gases, and other airborne irritants.

(*Id.*) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.58.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.* at PageID.59.) This included representative jobs as bench assembler, office clerk, and inspector. (*Id.* at PageID.60.) Accordingly, Plaintiff was found to be not disabled. (*Id.*)

     **E.**     **Administrative Record**

          **1.**     **Overview of Medical Evidence**

               **a.**     **Treatment Notes**

Plaintiff's records report that Plaintiff reported to the emergency room two days after a possible seizure in December 2013. (ECF No. 11-7, PageID.240.) She had no history of seizure or neurological issues. (*Id.* at PageID.241.) Plaintiff complained of chest pressure and frequent headaches (though the headaches were minimal then). (*Id.*) She

denied shortness of breath. (*Id.*) Plaintiff's records reference a history in 2009 of hypertrophic cardiomyopathy status post ablation, and a history of diagnoses of arrhythmia, clotting disorder, carotid artery occlusion, cyanosis, coronary artery disease, syncope, hyperlipidemia, chronic obstructive asthma, diabetes, and malignant neoplasm. (*Id.* at PageID.240, 242.) Plaintiff's physical examination showed she was oriented and well-developed; her neck had normal range of motion; she had no respiratory distress; she had normal strength and no cranial nerve deficit; and she had normal mood, affect, behavior, judgment, and thought content. (*Id.* at PageID.243.) Plaintiff was admitted to the hospital, given that there was a concern about possible acute coronary syndrome, seizure versus syncopal episode, and troponin elevation. (*Id.* at PageID.246.) While hospitalized, Plaintiff described her seizure event with her feelings of lightheadedness, dizziness, and palpitations. (*Id.* at PageID.247.) She also described feeling palpitations, chest tightness, or headaches that have occurred on and off for years. (*Id.* at PageID.247–48, 252.) At that time, she denied chest pain, palpitations, edema, and claudication. (*Id.* at PageID.252.) Examination showed she had an enlarged thyroid and 2/6 systolic murmur. (*Id.* at PageID.254.) She had increased blood pressure. (*Id.* at PageID.253.)

Plaintiff was medically stable throughout her hospitalization and discharged in stable condition. (*Id.* at PageID.276.) She had no recurrent events and was chest-pain free during hospitalization. (*Id.*) The syncopal episode had possible cardiogenic etiology and was unlikely a seizure. (*Id.*) Plaintiff was directed to not drive for six months. (*Id.*)

During hospitalization, she had CT scans of her head and chest; they showed no acute intracranial pathology, no pulmonary embolism, a small hiatal hernia, an enlarged

substernal soft tissue structure, and diverticulosis coli. (*Id.* at PageID.300, 302.) Later, another MRI of her head showed no acute intracranial process and nonspecific subcortical white matter foci. (*Id.* at PageID.323.) Plaintiff had an enlarged thyroid gland. (*Id.* at PageID.321.)

In January 2014, an echocardiogram displayed severe left ventricular hypertrophy consistent with her diagnosis of hypertrophic arthropathy. (*Id.* at PageID.319.) She had a left ventricular ejection fraction of 55%. (*Id.*) Plaintiff's heart had regular rate and rhythm. (*Id.* at PageID.320.) Her lungs were clear, and she had no edema. (*Id.*)

In February 2014, with Plaintiff's cardiologist, she was placed on a 48-hour Holter monitor. (*Id.* at PageID.314.) She had no pauses, no significant arrhythmia, one isolated ventricular couplet, and four atrial runs. (*Id.*) Also in February, in a meeting with Plaintiff's neurologist, Plaintiff denied any focal neurological symptoms such as numbness, tingling, weakness, or vision change. (*Id.* at PageID.316.) Plaintiff complained of headaches. (*Id.*) She described headaches that included occurrences over 27 years; there was no change in their character, quality, or severity; the headaches last for a couple of hours if treated, or they last all day if not treated. (*Id.*) The doctor considered Plaintiff's headaches to be medication overuse headaches (MOH) and she requested Plaintiff to discontinue the daily headache medications. (*Id.* at PageID.318.) The doctor also noted, regarding Plaintiff's MRI, that the white matter lesions "probably represent chronic ischemia related to her hypertension." (*Id.*)

In July 2014, Plaintiff reported an episode of bilateral lower extremity edema that lasted for two weeks, but at the time of examination, Plaintiff showed no edema. (*Id.* at PageID.314–15.)

Almost two years later, in April 2016, Plaintiff reported occasional dizzy spells and shortness of breath with climbing stairs, and she was placed on 24-hour Holter monitor. (*Id.* at PageID.381.) In June 2016, at a follow up appointment, an echocardiogram showed moderate asymmetric left ventricular hypertrophy, severe dilatation of the left atrium along with moderate mitral regurgitation, and moderate pulmonary hypertension was noted. (*Id.* at PageID.377.)

In June 2016, Plaintiff reported to the urgent care for a cough and ear pain, but she was directed to the emergency room for high blood pressure. (*Id.* at PageID.394.)

In June 2018, Plaintiff experienced a stroke, and she was hospitalized. (ECF No. 11-10, PageID.769.)

In February 2019, Plaintiff underwent a left thyroid lobectomy. (ECF No. 11-11, PageID.880.)

### b.    Opinion Evidence

Plaintiff's disability claim was evaluated by state agency doctor Dr. Thomas Flake. (ECF No. 11-3, PageID.83–92.) He determined Plaintiff's medically determinable impairment was other diseases of the circulatory system (severe). (*Id.* at PageID.87–88.) Plaintiff's symptoms of weakness and fatigue were found to be partially consistent with the medical evidence. (*Id.* at PageID.88.) Plaintiff's residual functional capacity was found to be as follows, through the date last insured of December 31, 2013. (*Id.* at PageID.89.)

Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. (*Id.*) She could stand/walk for six hours of an eight-hour workday and sit for six hours of the workday. (*Id.*) She could occasionally climb stairs, balance, stoop, kneel, crouch, crawl, and she could never climb ladders. (*Id.*) She had no manipulative limitations. (*Id.* at PageID.90.) Plaintiff should avoid all exposure to hazards. (*Id.*) Plaintiff was found to be able to do light work and was determined to be not disabled. (*Id.* at PageID.91–92.)

### 2.    Application Reports and Administrative Hearings

#### a.    Function Report

Plaintiff claimed that she cannot work because of these conditions: she has a tilted spine and degenerative arthritis in her neck; she has shortness of breath, dizziness, headaches that make it difficult to ambulate, fatigue, and weakness; she cannot walk 10–15 feet without taking a break, she cannot sit or stand for long periods of time. (ECF No. 11-6, PageID.206.) Further, Plaintiff described daily of activities of making meals, watching TV, and using the computer; some of these activities may be interrupted by headaches, nausea, or diarrhea. (*Id.* at PageID.207.) She said every day is different. (*Id.*) Plaintiff has difficulty sleeping due to cramping and pain. (*Id.*) She needs assistance with personal care: she cannot raise her arms sometimes, and there is difficulty with bathing. (*Id.*) She says she needs reminders for personal grooming and taking medication. (*Id.* at PageID.208.)

Plaintiff prepares foods like sandwiches, soups, and TV dinners. (*Id.*) Her daughter assists several times per week. (*Id.*) She used to prepare larger meals regularly. (*Id.*) She does not do household chores or yardwork because she cannot stand or sit for long and

cannot stoop, kneel, or reach. (*Id.* at PageID.208–09.) Plaintiff does not go outside alone or drive because of cramping or headaches that affect her focus or concentration. (*Id.* at PageID.209.) She can shop for groceries, about once a month. (*Id.*) Plaintiff can handle money. (*Id.*)

Plaintiff's hobbies include watching TV, computer games, and shopping, but her condition limits how long she does these things. (*Id.* at PageID.210.) She spends time with others, either in person or by the phone, for a couple times per week. (*Id.*) She regularly goes to doctor's appointments. (*Id.*) She needs to have someone accompany her when she goes places, and she needs reminders to go places. (*Id.*)

Plaintiff claims her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, memory, complete tasks, concentrate, understand, and follow instructions. (*Id.* at PageID.211.) Her headaches, cramps, and being out of breath affect these abilities. (*Id.*) She says she can walk 10–15 feet before needing to rest for five to 15 minutes. (*Id.*) She can pay attention for 15–20 minutes, and she does not finish what she starts. (*Id.*) She has difficulty with written and spoken instructions; she needs to reread them or occasional have them repeated. (*Id.*) Plaintiff does not handle stress or changes in routine well. (*Id.* at PageID.212.) She has unusual anger or anxiety. (*Id.*)

Plaintiff takes medication that has side effects of nausea, diarrhea, dizziness, headaches, tiredness, shortness of breath, memory problems, and a fast heartbeat. (*Id.* at PageID.213.)

### b.      Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that she is 57 years old, and she has an associate degree in management. (ECF No. 11-2, PageID.70.) Plaintiff was a job setter for 15 years. (*Id.*) She stopped working in 2008 because her employer closed. (*Id.*) Plaintiff explained she cannot work because of heart issues that make climbing stairs difficult, of frequent restroom use, and of bad headaches that make computer use difficult. (*Id.* at PageID.71–72.) She had headaches for 34 years, but the bad headaches she described started before 2013. (*Id.* at PageID.72.) The headaches last for three to four days. (*Id.* at PageID.74.) She explained that her heart doctor said that she cannot take Tylenol for her headaches, so she has used ice packs. Plaintiff complains of swollen feet that makes it difficult to stand; the length of time that Plaintiff can be on her feet depends on how swollen her feet are. (*Id.* at PageID.73.) Plaintiff had an enlarged thyroid issue in 2013 and a stroke in June 2018. (*Id.* at PageID.74–75.) Plaintiff said she had issues with memory and concentration that became worse since her stroke. (*Id.* at PageID.75.)

Plaintiff has help from her daughter for chores and shopping. (*Id.* at PageID.76.)

### c.      The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The ALJ inquired of the VE about a hypothetical as follows, assuming Plaintiff's age, work experience, and education:

> Assume the individual can stand and walk six of eight hours, could sit up to six of eight hours, could lift 20 pounds occasionally, and ten pounds frequently, could occasionally climb, balance, stoop, kneel, crouch, or crawl, could never climb ropes, ladders, or scaffolds, must avoid all hazards which is open moving machinery and unprotected heights, and would need a clean

> air environment free from concentrated levels of dust, fumes, chemicals, gasses, and other airborne irritants.

(*Id.* at PageID.78.) The VE stated that the individual could not perform Plaintiff's past work as a job setter. (*Id.*) The VE identified jobs that could be performed within this hypothetical that included bench assembler (250,000 jobs, nationally), general officer clerk (200,000 jobs, nationally), and inspector (180,000 jobs, nationally). (*Id.* at PageID.78–79.) For a second hypothetical, the ALJ inquired about

> If you were to assume the same hypothetical individual but assume the individual could stand and walk up to four hours of an eight hour day, but only for 20 minutes at a time, and could sit up to six hours of an eight-hour day, but only for one hour at a time. The individual would need to avoid operating commercial vehicles and avoid all hazards such as, but not limited to, open bodies of water, open flames, moving machinery, sharp objects, and unprotected heights, and would need to avoid slippery or shifting surfaces.

(*Id.* at PageID.79.) The VE identified this hypothetical would reduce the number of identified jobs; there would be 90,000 jobs for bench assembler, 75,000 jobs for general office clerk, and 90,000 jobs for inspector. (*Id.*) Next, the ALJ inquired

> If an individual required a low-stress environment defined as no quick decision making and no quick judgment required on the job and would be unable to perform jobs that are fast-paced, high production or frequent changes in task, expectations, or locations. Would that affect the ability to perform the jobs you've listed?

(*Id.* at PageID.79–80.) The VE said these limits would not affect the identified jobs. (*Id.* at PageID.80.) Next, the ALJ asked about absenteeism, and the VE identified that missing work two or three times per month would preclude all competitive work. (*Id.*) Also, taking several unscheduled breaks of ten to 15 minutes would preclude all competitive work. (*Id.*)

The VE stated her testimony was consistent with the *Dictionary of Occupational Titles*, but the following types of limitations were based on her knowledge and professional experience because the *DOT* does not address them: breaks, absenteeism, low-stress work, number of changes, slippery or shifting surfaces, commercial driving, alternate positions of sitting and standing, and changes in the right work description. (*Id.*)

**F.    Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)    Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)    Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

15

(ii)     Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or

her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a

medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your

19

statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when

considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or

nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)     [D]aily activities;

    (ii)    The location, duration, frequency, and intensity of . . . pain;

    (iii)   Precipitating and aggravating factors;

    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

    (1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G.    Arguments and Analysis

#### 1.    The ALJ's consideration of retrospective medical evidence showing cause, persistence and intensity of Plaintiff's symptoms.

Plaintiff argues that the ALJ erred in not considering "retrospective" medical evidence of the cause, persistence, and intensity of Plaintiff's hypertrophic cardiomyopathy symptoms.

Plaintiff's alleged onset date of her disability is December 2, 2013. (ECF No. 11-5, PageID.172.) That same month, her date last insured was December 31, 2013. (*Id.* at PageID.176; ECF No. 11-2, PageID.54.) Perhaps the most significant event to this period of time was Plaintiff's seizure-like activity and syncope of December 2013. (ECF No. 11-2, PageID.56, citing ECF No. 11-7, PageID.240.)

Plaintiff claim that the ALJ did not consider the totality of the circumstances or accurately consider evidence after the date last insured is not persuasive. The record of Plaintiff's history of hypertrophic cardiomyopathy, before December 2013, is limited to only historical reference in the records in the transcript. Said another way: Plaintiff has no

reference to or citation of contemporary medical records of her condition from when her hypertrophic cardiomyopathy was first diagnosed to her earliest medical record in the transcript. Plaintiff suggests, that given the nature of her history with hypertrophic cardiomyopathy, that the syncopal event was related to that condition. However, Plaintiff cites to no medical record that is directly supportive of this suggestion. Similarly, Plaintiff asserts that her condition is progressive, citing to events of a 2001 alcohol ablation procedure and a 2018 stroke, but again her argument lacks any reference to medical record evidence that connects these events in any way.

Plaintiff argues that the ALJ's review of the medical evidence is inconsistent with the Sixth Circuit cases of *Ellis v. Schweiker*[1] and *Blakenship v. Bowen*[2]. *Ellis* and *Blakenship* involve claimants' chronic psychological conditions and the respective relevant evidence before and after the date last insured. In contrast, Plaintiff supplies no direct evidence that suggests that she has a chronic condition with consequences of work-related limitations (being greater than the ALJ found) and with other collateral medical-condition consequences. Plaintiff suggests that given "the nature of hypertrophic cardiomyopathy" and her "medical history" that the ALJ "should have given greater consideration . . . [to find] that [Plaintiff's] syncopal event was related to her hypertrophic cardiomyopathy . . . ." (Pl. Br., ECF No. 16, PageID.1100). This statement is contrary to Plaintiff's burden of supplying the evidence to prove that she is disabled. 20 C.F.R. § 404.1512(a); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). Plaintiff does cite to three events—

---

[1] 739 F.2d 245 (6th Cir. 1984).
[2] 874 F.2d 1116 (6th Cir. 1984).

the 2001 alcohol ablation procedure, her 2013 conditions of dizzy spells and fatigue where she had difficulty with stairs and chores, and a 2018 stroke—to suggest that she has a chronic and worsening condition but she does not cite any medical evidence that shows progression of her condition. This failure is significant because, again, it is Plaintiff's burden to provide that evidence.

I suggest substantial evidence supports the ALJ's findings. The ALJ accurately cited the medical record of Plaintiff's discharge summary from her hospitalization, saying that her "acute syncopal episode was possibly cardiogenic in nature." (ECF No. 11-2, PageID.56, citing ECF No. 11-7, PageID.276.) In contrast, Plaintiff asserts, without any medical support, Plaintiff's syncopal event was the result of her hypertrophic cardiomyopathy. Next, rather than relying on the ejection fraction data alone, as Plaintiff cites, the ALJ considered the range of factors at issue during Plaintiff's hospitalization, including on/off chest tightness, headache, palpitations and chest pain, elevated blood pressure, severe left ventricular hypertrophy, and no stenosis found on cardiac catheterization. (*Id.*) Plaintiff cites to no record evidence that substantiates the need to give "greater weight" to Plaintiff's left ventricular hypertrophy, and particularly there is no cited evidence involving any work-related limitation.

Plaintiff misconstrues the ALJ decision when she argues that the ALJ found Plaintiff's cardiomyopathy was not severe enough to prevent her from doing light work because of her lack of further evaluation of her symptoms. Here, the ALJ was articulating how Plaintiff's symptoms were not entirely consistent with the medical evidence. (*Id.* at PageID.57.) Specifically, the ALJ was citing Plaintiff's claims at hospitalization of chest

pain/tightness and palpitations, and further the ALJ cited that Plaintiff did not seek treatment for these symptoms and explained this suggests a non-disabling severity of those symptoms. It is true, as Plaintiff cites, that she attended to medical appointments four times in 2014. The ALJ also noted this but found those appointments were not regarding her earlier claims about chest pain/tightness and palpitations.

Plaintiff posits that her symptoms related to hypertrophic cardiomyopathy are unpredictable, in that the symptoms could be stable for a long period or vary from day to day. Even if one assumes that unpredictable symptoms are correct generally, it is Plaintiff's burden to point to evidence of the unpredictable symptoms arising in the past, e.g., in notes taken by her medical providers, and to prove her disability.

The ALJ considered Plaintiff's obesity, according to SSR 19-2p. Plaintiff claims without documented medical evidence that her obesity was related to any other medical condition or supportive of greater work-related limitations.

The ALJ considered Plaintiff's testimony. The ALJ is not required to accept testimony that is inconsistent with the medical record; as the ALJ so found. *See Jones*, 336 F.3d at 476.

### 2.    Substantial Evidence Supports the ALJ's Decision on Plaintiff's Headaches

Plaintiff claims the ALJ erred in finding that her headaches were not severe. Plaintiff is incorrect.

First, assuming for a moment that Plaintiff's headaches were severe for the purposes of step two of the sequential evaluation, that alone is not reversible error because there

were other impairments found to be severe, and the ALJ continued with the evaluation process. *Schlacht v. Comm'r of Soc. Sec. Admin.*, 2019 WL 7586531, at *11 (citing *Fisk v. Astrue*, 253 F. App'x 580, 584 (6th Cir. 2007); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). In continuing the evaluation, the ALJ must consider "the combined effect of all impairments," both severe and non-severe, in determining the RFC. *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009); 20 C.F.R. § 404.1523(c). With this framework, Plaintiff's conditions and limitations may be properly considered at the later steps of the disability evaluation.

The ALJ found two of Plaintiff's conditions to be not severe. The ALJ explained that Plaintiff's syncope and headaches were not severe because the syncope was isolated and the history of headaches were possibly related to medication overuse, per medical record, and further that they did not interfere with Plaintiff's ability to perform basic work functions under the severe impairment definition. (ECF No. 11-2, PageID.54. *See also* 20 C.F.R. § 404.1522.)

Plaintiff emphasizes two components of evidence: 1) Plaintiff's December 2013 MRI with the impression of subcortical white matter (and history of migraines), and 2) her testimony. The ALJ acknowledged the existence of this MRI, and specifically citing to Dr. Elizabeth Smith's observation of Plaintiff's long history of migraine headaches and attributed them to medication overuse. (ECF No. 11-2, PageID.56, citing ECF No. 11-7, PageID.318.) In addition, the ALJ considered Plaintiff's testimony of headaches (for example, that they lasted three to four days, and the medication or ice packs that she used for a remedy) and found her testimony not entirely consistent with the medical record. (*Id.*

27

at PageID.55–57.) The ALJ committed no error in the consideration and evaluation of this evidence. However, Plaintiff continues, citing purported authority from the Cleveland Clinic website about brain lesions and headaches. Plaintiff fails to explain how this is acceptable medical evidence of her condition specifically, rather than evidence of the condition generally. *See*, *generally*, 20 C.F.R. §§ 404.1502, 404.1520b, 404.1513 (defining types of evidence and how evidence is considered; *see also Watson v. Barnhart*, 194 F. App'x 526, 530 (10th Cir. 2006) (A claimant's interpretation of a medical journal article "is not recognized as impairment evidence."). Next, Plaintiff's citation to *Echols v. Comm'r of Soc. Sec.*[3] does not persuade because while it is *possible* that headaches *could* be a severe impairment, Plaintiff's disability must be based on her medically determinable impairment with supportive medical evidence. *See*, *e.g.*, 20 C.F.R. §§ 404.1505, 404.1520, 404.1521. This same analysis applies to Plaintiff's citation to *Ellis v. Schweiker.*

Plaintiff claims the ALJ erred by discounting her credibility in light of her "outstanding work record." The basis for Plaintiff's argument that a good work history is probative of her credibility is *White v. Comm'r*, 312 F. App'x. 779, 789 (6th Cir. 2009) (citing SSR 96-7p). However, the foundation of Plaintiff's concept is no longer good law; *White* cites credibility analysis of SSR 96-7p, and this was superseded by SSR 16-3p. SSR 16-3p provides for the evaluation of Plaintiff's symptoms in a disability claim. Here, the ALJ properly considered Plaintiff's testimony and symptoms under the relevant framework.

---

[3] 2009 WL 3852528, at *2 (E.D. Mich. 2019).

Overall, Plaintiff is simply requesting this Court to reweigh her favorable evidence to find disagreement with the ALJ's conclusion. However, "even if additional evidence in the record could support a finding of disability," a Court will "not reweigh the evidence considered by the ALJ." *Seibert v. Comm'r of Soc. Sec.*, 2019 WL 1147066, at *2 (E.D. Mich. 2019) (*citing Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013) ("Even if we would have taken a different view of the evidence were we the trier of facts, we must affirm the ALJ's reasonable interpretation.").

### 3. Substantial Evidence Supports the RFC Established by the ALJ and the Inquiry to the VE.

Plaintiff claims[4] that the ALJ erred in forming an RFC that did not account for her headaches, and that the ALJ did not inquire about headaches with the VE.

Plaintiff reports, through her medical record, her lengthy history of headaches. Plaintiff testified about her lengthy history of headaches and about her difficult observing computer screens. The ALJ considered the medical evidence, which included a possible source of Plaintiff's headaches as her medication overuse; the ALJ concluded that Plaintiff's headaches were not severe. The ALJ also concluded that Plaintiff's symptoms were not entirely consistent with the medical evidence.

---

[4] Plaintiff begins her argument here by claiming error occurred step five of the sequential analysis, but the weight of the argument is a challenge to the RFC. *See Kirchner v. Colvin*, 2013 WL 5913972, at *11 (E.D. Mich. 2013) ("Kirchner's Step Five argument is a veiled attack on the ALJ's underlying RFC finding" because "this is not a scenario where the ALJ's hypothetical failed to match up to the RFC he ultimately imposed"); *see also Flynn v. Comm'r of Soc. Sec. Admin.*, 2018 WL 5306640, at *3 n.2 (E.D. Mich. 2018) ("Since the rest of this argument is entirely focused upon the supportability of the RFC, as opposed to the Step 5 analysis, the Court will treat it solely as an attack on the ALJ's underlying RFC finding."), *rep. and rec. adopted*, 2018 WL 5305077 (E.D. Mich. 2018).

The ALJ must only incorporate limitations in the RFC or hypothetical question that are found credible. *Allen v. Comm'r of Soc. Sec.*, 2015 WL 4617445, at *8 (E.D. Mich. 2015). The ALJ properly explained the limitations and the absence of headache-related limitations in the RFC. (ECF No. 11-2, PageID.56.)

Plaintiff's citation of evidence about testimony or record of Plaintiff's social life, her daughter's assistance with her chores, her headaches, the MRI results, are all evidence that the ALJ considered. Plaintiff's request for the court to reweigh this evidence to disagree with the ALJ's conclusions is not sufficient to undermine the substantial evidence supporting the ALJ's decision. .

Plaintiff's citation to *Arvin v. Comm'r of Soc. Sec.*, 2020 WL 3052732 (E.D. Mich. 2020) (rep. and rec.) is misplaced. Nothing in *Arvin* demonstrates that its analysis is the exclusive manner to analyze a claimant's headaches, as Plaintiff asserts. Contrary to what Plaintiff asserts, the ALJ in *Arvin* considered that claimant's individual medical record and testimony, considered his claim of headaches, and came to the conclusion that the particular Plaintiff was disabled. The Court found substantial evidence supported the ALJ's conclusion. However, that conclusion, based on individualized facts, does not universally apply to all cases involving headaches. In cases where substantial evidence supports a finding of disability or non-disability, the ALJ's choice between two proper conclusions must be upheld. Here, the ALJ considered Plaintiff's testimony about the duration of her headaches, the frequency of her headaches, her attempts at remedies for her headaches, the medical advice that her headaches were due to medication overuse, and finally, that the MRI of her brain suggested that the nonspecific white matter lesions were probably related

to hypertension. (ECF No. 11-2, PageID.56.) This is consistent with the ALJ's obligations under SSR 16-3p and 20 C.F.R. § 404.1529. I therefore suggest that the ALJ's findings are supported by substantial evidence.

Plaintiff claims the ALJ erred by failing to incorporate limitations related to Plaintiff's headaches and her use of computer screens. Other than her testimony, Plaintiff fails to present medical evidence that credibly supports either limitation. Further, the ALJ is not required to accept Plaintiff's testimony about computer screens without consistent medical evidence. Finally, Plaintiff appears to assume that computer use is a function of the office clerk[5] position, and that she could not perform that job if there was a computer-related work limitation. Plaintiff cannot raise a claim of error and leave it to the Court to scour the record to support her claim. *See Muschiana v. Comm'r of Soc. Sec.*, 2012 WL 4498821, at *5 (E.D. Mich. 2012), *rep. and rec. adopted*, 2012 WL 4476653 (E.D. Mich. 2012).

### H.   Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 16), **GRANTING** the Commissioner's motion, (ECF No. 19), and **AFFIRMING** the Commissioner's final decision denying benefits.

---

[5] While the VE and the ALJ identified the position at issue, in the VE testimony and the ALJ decision, as a general office clerk or office clerk (respectively), both the VE and ALJ identified that this job (and the other jobs) are representative samples and not exhaustive of the work that Plaintiff could perform. Specifically, the sample office clerk job in the ALJ decision is identified as a mail clerk under the decision's citation to 209.687-026 in the *Dictionary of Occupational Titles*. Plaintiff develops no argument that a mail clerk uses a computer as a part of a the job.

III.   <u>**REVIEW**</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 17, 2021                    S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge